JUDGES: Hon. Carol Ann Robb, Hon. Gene Donofrio, Hon. Mary DeGenaro
OPINION
ROBB, P.J.
*62 {¶ 1} Plaintiff-Appellant Debra S. Kight appeals the decision of the Mahoning County Common Pleas Court granting summary judgment in favor of Defendants-Appellees Wilbur Miller and David Wheeler in a suit seeking to void a deed based on allegations of fraud and/or mistake. Appellant alleges the court improperly evaluated the credibility of her affidavit. She contends there was a genuine issue of material fact as to whether she intended to sign the documents or whether there was fraud in the execution. She also states there is an issue regarding consideration for the deed, urging there is a dispute as to whether there was ever an underlying personal loan. Due to factual disputes, the trial court's judgment is reversed.
STATEMENT OF THE CASE
{¶ 2} Kight owned realty at 468 W. Midlothian Boulevard in Youngstown. On April 16, 2015, she and Miller signed a release from indebtedness, wherein Miller agreed to release her from a loan secured by her house as collateral if she provided him the deed to her house. On April 17, 2015, Kight signed a warranty deed transferring this property to Appellees, who are domestic partners. The deed listed the consideration paid by the grantees as $15,328.75 (corresponding to the amount in the release said to be due on the loan, plus interest and late fees). The deed was recorded on April 20, 2015. Miller filed a forcible entry and detainer action against Kight in the Youngstown Municipal Court on October 27, 2015. That case was stayed after Kight filed her December 10, 2015 complaint against Appellees in the Mahoning County Common Pleas Court. (She filed an amended complaint with leave of court on March 23, 2016 due to the mistaken use of Wheeler's name instead of Miller's name in certain sentences.)
{¶ 3} Kight's complaint sought quiet title to the property and urged the deed was void ab initio. She alleged fraud and unilateral mistake in signing the documents. The complaint alleged: Miller asked if she was interested in obtaining grant money and assistance from a trust in order to make repairs to her home; she replied she was interested; in mid-April 2015, paperwork was brought to her house in order to access grant money for her home; she read through the grant and trust papers; Miller told her the papers needed to be signed in front of a notary; he put the papers in an envelope and took her to the Bureau of Motor Vehicles (BMV); he dropped her off at the door and parked the car; he pulled the signature pages out of the envelope at the BMV; she signed the documents in front of the notary without re-reading them, relying on the fact she had just read them at her house and trusting Miller was presenting the same documents for her signature; and she signed the documents under the belief they would allow her to access grant monies. The complaint said sixty-three-year-old Kight did not intend to sign a personal loan (with payments that were 63% of her monthly income from Social Security Disability) and she did not intend to use her home as collateral for home repairs.
{¶ 4} Instead of filing an answer, pro se Appellees filed a motion for summary judgment on December 18, 2015 and an amended motion for summary judgment on December 21, 2015. Appellees emphasized how both pages of the deed, drafted by Miller, were clearly captioned with "WARRANTY DEED" and Kight initialed the first page and signed the second page. (Motion Ex. A). Appellees attached a December 15, 2015 affidavit from the notary who acknowledged Kight's signature on *63 the deed; her affidavit said both pages of the deed were signed/initialed in her presence. (Motion Ex. B). Appellees also attached a BMV receipt issued by this notary on April 17, 2015 showing the payment of a notary fee. (Motion Ex. F).
{¶ 5} Appellees pointed to the release from indebtedness, a five-page document drafted by Miller and signed by Miller and Kight on April 16, 2015 in front of a different notary. (Motion Ex. C). Kight signed the fifth-page on a signature line pre-labeled with her name and then the word "Debtor." Appellees submitted a December 16, 2015 affidavit of this notary attesting the parties appeared before him with identification to sign and acknowledge the information on the release. (Motion Ex. D). They also submitted a BMV receipt showing two notary fees were paid to this notary on April 16, 2015. (Motion Ex. E).
{¶ 6} The April 16, 2015 release from indebtedness stated Miller lent Kight $13,500 on January 12, 2014 when she executed a personal loan installment contract. The release said the loan agreement contained the following terms: the loan was to be repaid, beginning March 3, 2014, in 36 installments of $470 per month, which included principal and interest at a rate of 8.5% per annum; a late fee of $35 was to be charged for payments made after the eighteenth of the month; default would occur after three unpaid payments; upon default, Miller could foreclose on the described realty as the personal loan was issued with a "proviso" that it was secured by the realty; and Kight pledged the realty as collateral for the personal loan.
{¶ 7} The release also said a loan modification was entered soon after the first payment was due, whereby Miller agreed to delay collection based upon Kight's assurance she would receive a settlement on April 3, 2015 and would then pay him principal, interest of $1,338.75, and late fees (for fourteen months) in the amount of $490, for a total sum of $15,328.75. The release set forth the following: Miller demanded payment from Kight on April 8, 2015; Kight admitted she falsely represented she would be receiving a settlement; Kight said she could not repay the loan; she offered a deed in lieu of foreclosure; and Miller agreed to have the release of her indebtedness notarized in exchange for the deed to her property. The release said Kight would vacate the residence by May 1, 2015. It also outlined personal property Kight sold to Miller upon his April 10, 2015 tender of $1,650.
{¶ 8} In arguing for summary judgment, Appellees pointed out the documents do not denote any affiliation with a grant or trust program. They urged common logic shows Kight knew what she was signing. They pointed to the two separate BMV visits to sign the release and then the deed. Appellees attached the affidavit of Wheeler's mother as to how she knew Kight and the affidavit of Miller's friend who said she heard a detective accuse Miller of forging the deed. A statement of Wheeler's father was not an affidavit as it was not notarized; it did not contain support for the main positions in any event. (Motion Ex. L-N).
{¶ 9} Appellees' pro se motion made various factual allegations, but the motion was not accompanied by their own affidavits to support their main allegations. The motion factually claimed: they had no discussion with Kight about a grant or assistance with home improvement; they did not advise Kight the deed or release related to a grant or trust; Kight misled Miller into believing her income was $3,000 per month; Kight only ceased driving because her boyfriend caused her car to be impounded; Kight was fully aware of the material facts in the documents; and her *64 behavior became bizarre sometime after the deed was recorded.
{¶ 10} Appellees' summary judgment motion says Miller left a note along with the county auditor's property card for this property on Kight's front door on April 21, 2015, to show he recorded the deed. The motion points to ¶ 26 of the complaint which states Ms. Kight received a letter "[o]n or about April 21, 2015" advising her the house had been conveyed to Appellees. The motion speaks of occurrences after this date, such as friendly texts between Miller and Kight and a trip to some stores (on May 6, 2015), urging this does not reflect a person who had just been defrauded.
{¶ 11} Appellees pointed to ¶ 27 of the complaint where Kight acknowledged she received a handwritten eviction notice from Miller on May 27, 2015. Appellees said Kight also received it by certified mail on May 29, 2015. (Motion Ex. G). Appellees disclosed an incident report Kight filed with the Youngstown Police Department on May 29, 2015; they complain Kight told the officer Miller was "trying" to convey property which was in her name, when in fact the property had already been conveyed. (Motion Ex. H). Appellees also attached to their summary judgment motion Miller's complaint for forcible entry and detainer, which incorporated a September 1, 2015 thirty-day notice to vacate the premises and an October 9, 2015 three-day notice to vacate the premises. (Motion Ex. J). They complained Kight waited until after Miller filed the eviction action to file her suit.
{¶ 12} Upon Kight's motion, a magistrate ordered discovery to proceed before a response to Appellees' summary judgment motion would be due. Miller's deposition was taken on April 12, 2016. Kight filed Miller's 219-page deposition with the court on May 4, 2016, along with her response to Appellees' summary judgment motion.[1] Kight's response urged there were conflicting facts and inferences resulting in genuine issues of material facts as to whether there was fraud and mistake. She argued there was no meeting of the minds as to the deed or the release from indebtedness. After acknowledging a decision to forgo reading an agreement generally does not relieve a party of the obligations incurred by signing it, the response pointed out the doctrine of fraud in the execution is an available defense, which covers cases where there is a surreptitious substitution of one paper for another or obtaining an instrument by trick or deceit which the party did not intend to give. Citing McBennett v. Piskur , 3 Ohio St.2d 8, 209 N.E.2d 138 (1965) ; Perry v. M. O'Neil & Co. , 78 Ohio St. 200, 85 N.E. 41 (1908). Kight pointed out a signed instrument is "prima facie evidence" of the truth of its contents and provides a presumption the recitals in the instrument are true; but, the presumption is rebuttable rather than conclusive.
{¶ 13} Kight attached her own affidavit which attested: she was 63 years of age; her sole source of income was Social Security;
*65 she owned the property at 468 W. Midlothian Boulevard free and clear of liens; Miller brought her documents to allow her to obtain a grant and assistance from a trust to make repairs to her home; after she reviewed the documents, Miller put them in an envelope and they went to a notary; since she just read the documents, she signed the papers given to her by Miller; the documents Miller produced in this lawsuit are not the documents she reviewed and saw him put in the envelope; and she believed the documents she signed were switched or altered. She added, "[t]he documents I signed were on a clip board and I only saw the signature pages as the other pages were flipped up and I did not reread them and I did not exam[ine] them closely when at the notary." She swore she never received a loan from Miller, she never intended to sign a personal loan document using her house as collateral, and she would not have agreed to pay $490 per month on a loan on her limited income.
{¶ 14} Kight's response pointed out Appellees failed to attach the alleged personal loan or the alleged loan modification, noting Miller claimed the written loan agreement was stolen and the loan modification was verbal. Kight urged the resolution of the credibility of the witnesses should be evaluated at trial. She referred to Miller's deposition testimony on his criminal history and attached extradition filings from September 2013, stating he was wanted in Pennsylvania for theft and forgery. Kight also pointed to Miller's receipt of property at 105 W. Boston Avenue in Youngstown from a 62-year-old woman (Christina) in September 2013, after meeting her in July 2013.
{¶ 15} At deposition, Miller said he paid Christina $1 for her house; he said it was filled with trash and items associated with hoarding and was being cited by the city due to its condition. Miller said Christina was anxious to get her heirlooms, stocks, and bonds from under the hoarded contents of the house as she was worried the city would tear it down. Miller characterized this as the beginning of a "trick" Christina employed against him. At the time, Miller was living in a house he bought off eBay for under $3,000. He had no income except $80 per week Wheeler's parents paid him as rent for staying in his house. Miller testified Wheeler found jewelry and $10,000 in cash while cleaning Christina's belongings from the house after the transfer; he said Christina let him keep it and use it to pay for Miller's attorney due to his recent arrest on a fugitive warrant. (Depo. at 66). They also found government bonds and evidence of assets remaining after certain relatives of Christina died. Miller said he told Christina she had too many assets. Christina cashed the bonds and received a check for $85,600. She deposited the check into a checking account jointly owned by her and Miller. He then spent this money, saying it was a gift. (Depo. at 154). When Christina wrote checks on the account, they bounced.
{¶ 16} Miller was named Christina's power of attorney in a document stating an account was initially endowed with $85,600 in bond proceeds and a future half-million-dollar gift would be made; although he said the money was a gift, Miller also said this document granted him the power to make charitable contributions. (Depo. at 146-147). Miller testified he told Christina he was going to help people around him. (Depo. at 154). He said he first met Kight in January 2014, when she asked him for money. He said the $13,500 he allegedly loaned Kight in January 2014 came from a $15,000 cash gift Christina was going to provide him for a new roof on her old house. He said Christina provided a receipt for Kight's signature to show the *66 source of the money and to avoid any impression it could be drug money. (Depo. at 120). This receipt was not attached to Appellees' summary judgment motion. Miller also spoke of a paper signed by himself and Christina, which said: he received $15,000 from Christina in January 2014; $13,500 was to be lent to Debbie Kight; $1,500 was for house repairs; and Miller could keep the $13,500 upon repayment by Kight. (Depo. at 77-78). (This document was attached to an objection to a request for an extension, but it was not attached as an exhibit to his motions for summary judgment or reply.)
{¶ 17} Miller said Kight and Christina became friends after this. (Depo. at 180). After he received over $100,000 from Christina (and Wheeler received the $10,000 cash), Christina was going to gift him much more until they had a falling out. Miller said he provided Kight with the April 21, 2015 letter as he was worried due to her change in personality after signing the documents. He also testified Christina threatened him, broke into his house, and stole the January 2014 loan agreement signed by Kight. Miller disclosed Christina's family believes he obtained millions of dollars from her. (Depo. at 152). In response to Appellees' contentions regarding Christina, Kight's affidavit stated she never received a loan from or even met Christina.
{¶ 18} Appellees filed a reply in support of their motion for summary judgment on May 9, 2015, claiming Kight failed to meet her reciprocal burden of showing a genuine issue for trial. Appellees noted the complaint acknowledged Kight received the letter dated April 21, 2015, wherein Miller advised Kight the deed was recorded on April 20, 2015, her property was thus conveyed, and her indebtedness was resolved. They attached a copy of the letter, which they say was provided by Kight in discovery. (Reply Ex. B). Appellees attached a photograph of a text they said Miller sent to Kight on April 21 stating: "Just got done getting shingles. Took care of paperwork yesterday afternoon." (Reply Ex. K). Appellees' reply said Kight's lack of response to this text prompted Miller to put the letter on Kight's door.
{¶ 19} Appellees also pointed to Kight's bank statement from April 15, 2015 to May 15, 2015. (Reply Ex. E). They focused on a May 6 posting from a purchase at a market, a May 7 posting from a purchase at a convenience store, and a May 8 posting from a purchase at a coffee shop. Wheeler's affidavit stated they went to these locations with Kight on May 6, 2015; he said Kight opined Miller would receive more money for her house when he sold it if he cut down plants around the light pole. Appellees emphasized their assertion that Kight accompanied them to the store after receiving the April 21, 2015 letter; they said this shows she knew what she signed on April 16 and April 17, 2015 and noted Kight called police only after receiving an eviction notice.
{¶ 20} Appellees argued Kight's statement in her affidavit (explaining the documents were flipped up on a clipboard and she only saw the signature pages) was defeated by the notary's affidavit attesting both pages of the deed were presented to Kight for signature or initial. Appellees also believe this statement in Kight's affidavit was contradicted by the sentence in the complaint alleging Miller pulled the signature pages out of the envelope at the BMV.
{¶ 21} Miller's affidavit stated Wheeler was not involved in the transactions, and his name was placed on the deed because he was Miller's long-time partner; Wheeler's affidavit also stated he was not involved in the transactions. Miller's affidavit said he applied for a civil protection order *67 against Christina in June 2015. Appellees provided the judgment entry granting the protection order. (Reply Ex. J). They also attached a 25-page, handwritten (in printing), rambling letter they claim was written by Christina. (Reply Ex. F, G). The letter said the author was paying Kight to set up Miller; it also said the banker was involved. Appellees then attached two single pages written in cursive they also say were written by Christina, wherein she expressed anger about her assets. (Reply Ex. H, I).
{¶ 22} Appellees stated Christina "used" Miller to clean her house and find her hidden assets totaling over $1.6 million. Appellees accused Christina of paying Kight to fraudulently call police and claim Miller stole her house. They assert Kight's affidavit falsely says she never met Christina. They refer to the police report, which mentioned Kight received a letter from the county about her property. They believe the only letter sent by the county was to Christina on May 5, 2015, advising her that the check tendered for recording fees on Kight's property was from an account with insufficient funds. (Reply Ex. L).
{¶ 23} Miller's affidavit states he loaned Kight $13,500 derived from a $15,000 cash gift from Christina on January 12, 2014. Appellees also attached to their reply a receipt said to be signed by Kight on January 12, 2014, which states Christina gave her $13,500 for a "promissory note loan." (Reply Ex. M). Appellees said this did not create a loan between Christina and Kight because Christina was providing the cash on behalf of Miller. Miller's affidavit also relates: he and Kight signed loan documents on January 14, 2014, wherein she pledged her realty as collateral; after default, he allowed her to forgo paying her obligation until April 2015; Kight offered a deed in lieu of foreclosure upon default; he and Kight signed the release from indebtedness on April 16, 2015 in exchanged for Kight signing the deed on April 17, 2015; he never said he would facilitate a grant or trust for Kight's benefit; Kight had possession of the full documents at the BMV; he placed the letter on Kight's door on April 21, 2015 to inform her about the deed recording; he borrowed $1,650 from Christina in order to purchase personal property from Kight as listed in the release from indebtedness; and Christina thereafter stole the January 2014 loan document and was "extorting" him in June 2015.
{¶ 24} On May 20, 2016, the trial court granted summary judgment. The court recognized Kight claimed she signed the documents in order to receive grant money and assistance from a trust to make home repairs. The court noted Kight said she was only presented with the signature pages and did not know the contents of the documents. The court found this contrary to the affidavits of the notaries. The court adopted Appellees' observation that Kight did not complain until after Miller tried to evict her. The court noted Appellees' evidence showing the loan document was stolen by Christina, against whom they received a civil protection order for trying to extort them with documents. The court said this was supported by handwritten letters. The court found Appellees met their initial burden but Kight failed to meet her reciprocal burden, stating:
The Plaintiff claims she was confused by what was presented for signature. First, the Plaintiff claims she signed documents for a grant. Second, the Plaintiff claims she did not sign the entire documents but only the signature pages or last page before the notary. The Court cannot find that to be accurate as she has contradicted herself as knowing what she signed and then signing not *68 knowing what she signed. It is contrary to her claim.
From this entry of summary judgment, Kight (hereinafter Appellant) filed a timely notice of appeal.
SUMMARY JUDGMENT
{¶ 25} Summary judgment can be granted when there remains no genuine issue of material fact and reasonable minds can only conclude the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). The movant has the initial burden to show there is no genuine issue of material fact. Byrd v. Smith , 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, citing Dresher v. Burt , 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996). The non-moving party then has a reciprocal burden. Id. The non-movant's response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing there is a genuine issue for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E).
{¶ 26} The court is to consider the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the non-movant. See, e.g., Jackson v. Columbus , 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 11. Any doubts are to be resolved for the non-movant. Leibreich v. A.J. Refrig., Inc. , 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993). A trial court "may not weigh the proof or choose among reasonable inferences." Dupler v. Mansfield Journal Co. , 64 Ohio St.2d 116, 121, 413 N.E.2d 1187 (1980).
{¶ 27} Civ.R. 56 must be construed in a manner that balances the right of the non-movant to have a jury try claims that are adequately based in fact with the right of the movant to demonstrate, prior to trial, that the claims have no factual basis. Byrd , 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47 at ¶ 11, citing Celotex Corp. v. Catrett , 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We consider the propriety of granting summary judgment de novo. Comer v. Risko , 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Under a de novo standard of review, we review the case independently and give no deference to the trial court's decision. See, e.g., Diley Ridge Med. Ctr. v. Fairfield Cty. Bd. of Revision , 141 Ohio St.3d 149, 2014-Ohio-5030, 22 N.E.3d 1072, ¶ 10 ; Hines v. State Farm Ins. Co. , 146 Ohio App.3d 128, 131, 765 N.E.2d 414 (7th Dist. 2001).
{¶ 28} Civ.R. 56(C) states no evidence or stipulation may be considered in ruling on a summary judgment motion except as stated in Civ.R. 56. The evidence that can be used in ruling on summary judgment includes the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact. Civ.R. 56(C). Exhibits should be appropriately incorporated into an affidavit or other acceptable form of summary judgment evidence, i.e., mere attachment of documents does not render them appropriate summary judgment material. See Civ.R. 56(C),(E) ("Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit.") Pursuant to Civ.R. 56(E), affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. There is an exception where the non-movant fails to object to the form of the movant's summary judgment evidence, in which case consideration of unsworn and unauthenticated exhibits is within the trial court's discretion.
*69 State ex rel. Gilmour Realty, Inc. v. Mayfield Heights , 122 Ohio St.3d 260, 2009-Ohio-2871, 910 N.E.2d 455, ¶ 10, 17 ; State ex rel. Spencer v. East Liverpool Planning Comm. , 80 Ohio St.3d 297, 301, 685 N.E.2d 1251 (1997) ; Bank of America, N.A. v. Staples , 7th Dist. No. 14MA109, 2015-Ohio-2094, 2015 WL 3487106, ¶ 36-39.
ASSIGNMENT OF ERROR
{¶ 29} Appellant's assignment of error provides:
"The trial court committed reversible error by granting summary judgment with conflicting genuine issues of material fact including whether the documents in the alleged deed were ever signed; whether they were altered or switched; whether there was an underlying loan in consideration for the alleged deed; and whether the trial court should have judged the credibility of a witness."
{¶ 30} Appellant points out a contract requires a meeting of the minds. She reviews the law on fraud in the execution, which she believes the trial court ignored. She urges there is a genuine issue as to whether she intended to sign a deed and whether the documents she signed were altered or switched after she read them. She also states there was a genuine issue as to whether there was consideration for the deed, i.e., whether Miller provided a personal loan to Kight. She points out Miller claims the loan existed and claims it was secured by her house as collateral, but he never recorded a mortgage over the property (in the seventeen months before the loan agreement was allegedly stolen by Christina, a woman Miller claimed gifted him a house and money within three months of meeting her).
{¶ 31} Appellant points to her own affidavit, which contests Miller's portrayal of the events, and she emphasizes the strange and "outrageous" facts asserted by Appellees. She concludes this case revolves around credibility, which is a matter for trial. Appellant believes the trial court's entry evinces the court improperly weighed the evidence and the parties' credibility. Appellant states the court should not have said she "claims she was confused as to what was presented for signature." She also contests the trial court's finding that she contradicted herself.
{¶ 32} Appellees respond by urging the trial court did not judge credibility but judged only the sufficiency of the evidence presented and found the overwhelming facts they presented did not allow for competing inferences. They point to ¶ 26 of Appellant's complaint (stating Miller pulled the signature pages from the envelope at the BMV); they say this contradicts ¶ 12 of Appellant's affidavit (stating the documents she signed were on a clipboard and she only saw the signature pages as the other pages were flipped up). They also state the affidavit of the notary shows Appellant was presented with both pages of the deed (one for signature and one for initialing). They complain of the "delay" in Appellant asserting her claim after the documents were signed in April 2015.
{¶ 33} Regarding the January 2014 loan with the house as collateral, Appellees state an unrecorded mortgage is still valid as between the parties to the instrument, citing Sidle v. Maxwell , 4 Ohio St. 236 (1854). See also R.C. 5301.01 (just as a deed must be notarized, a mortgage must be notarized as well); Citizens Nat. Bank in Zanesville v. Denison , 165 Ohio St. 89, 95, 133 N.E.2d 329, 332 (1956) ("A defectively executed conveyance of an interest in land is valid as between the parties thereto, in the absence of fraud."). As to the existence of the loan as consideration, Appellees note the release from indebtedness Appellant signed before a notary restated the terms of the loan. They note a lost or destroyed instrument can be established *70 by other evidence. In addition, Miller's release of Appellant from her indebtedness was said to be consideration for the deed.
{¶ 34} In responding to Appellant's argument on her lack of intent to sign a deed and her claim the documents were switched prior to her signature, Appellees conclude there is no evidence of fraud in the execution. They claim Appellant's affidavit is self-serving, unsupported by documentary evidence, and not proper summary judgment evidence to meet her reciprocal burden. They contend Appellant's mere expression of her belief cannot negate summary judgment.
{¶ 35} The notarization of Appellant's signature on the deed and on the release, along with the affidavits of the notaries who acknowledged the documents, constitute evidence Appellant signed the documents. However, Appellant's complaint and response to the motion for summary judgment did not rely on an argument that she did not sign the documents in front of the notary. "When the signature is admitted the presumption is that the party signing the instrument understood its terms, and he is bound by it, unless he can prove facts that will avoid it ." Perry v. M. O'Neil & Co. , 78 Ohio St. 200, 225-226, 85 N.E. 41 (1908) (emphasis added). For instance, a release can be contested upon allegations of fraud. Haller v. Borror Corp. , 50 Ohio St.3d 10, 13, 552 N.E.2d 207 (1990). Such fraud can come in one of two forms: fraud in the execution (also called fraud in the factum) or fraud in the inducement. Fraud in the execution results in a void agreement, whereas fraud in the inducement can result in a voidable agreement. Id . at 13-14, 552 N.E.2d 207.
{¶ 36} As Appellant points out, where a deed is duly signed and acknowledged, "the law presumes that the contents of the deed were known to the grantor. However, this is a rebuttable presumption * * *." Lyon v. Balthis , 24 Ohio App. 57, 60, 155 N.E. 815, 816 (5th Dist. 1926). See also Perry , 78 Ohio St. at 208, 85 N.E. 41 (portion of jury charge was not challenged). A person cannot void an instrument by stating he was misled into signing a document different from what he intended if he could have known the truth by reading it. Haller , 50 Ohio St.3d at 14, 552 N.E.2d 207 (a release is not void for fraud in the execution where there was a misrepresentation of the contents of a release but the releasor failed to take the opportunity to read and understand the document before execution). Although Appellant did not re-read the documents at the BMV during notarization, there is no suggestion she failed to read the documents at her house prior to leaving for the BMV. Rather, she contends the documents were switched or altered after she read them.
{¶ 37} Fraud in the execution exists where the charging party engaged in some trick or device to procure the signature of the party to be charged on an instrument which she did not intend to give, such as where there is a surreptitious substitution of one paper for another at signing. Perry , 78 Ohio St. at 209-210, 220, 85 N.E. 41 (further examples include misreading a contract to an illiterate party or obtaining a signature from a party under anesthesia). "A release is obtained by fraud in the factum [also called fraud in the execution] where an intentional act or misrepresentation of one party precludes a meeting of the minds concerning the nature or character of the purported agreement." Haller , 50 Ohio St.3d at 13, 552 N.E.2d 207 (where device, trick, or want of capacity produces a lack of knowledge of the nature of the instrument or a lack of intent to sign such a release, then there was no meeting of the minds), citing *71 Picklesimer v. Baltimore & Ohio RR. Co. , 151 Ohio St. 1, 5, 84 N.E.2d 214 (1949).
{¶ 38} This is different from a case of fraud in the inducement, where the party to be charged admits she signed the instrument and received consideration therefor but asserts she was induced to do so by the other party's fraud or misrepresentation. Haller , 50 Ohio St.3d at 14, 552 N.E.2d 207. Some examples are when: a party signs a release based on a misrepresentation of the extent of her injuries; a party signs a document after the value of the consideration was misrepresented; or a party signs under duress or coercion. See id. Therefore, in fraud in the inducement, the party to be charged understood the nature and consequences of the document signed (but was induced to sign based upon a misrepresentation); but in fraud in the execution, the party to be charged did not understand the nature of the document signed due to fraud by the other party during the execution. See id.
{¶ 39} Contrary to Appellees' contention, Appellant did not merely rely on the allegations in the pleadings. Pursuant to Civ.R. 56, she responded with summary judgment evidence. She submitted Miller's deposition, which was reviewed supra. He provided an unusual background and context for his allegations. For instance, he said he loaned $13,500 in cash to Appellant in January 2014, when she was a stranger who asked for assistance after she heard about his new monetary situation. He said she signed a loan providing her house as collateral, but he never recorded a mortgage. In explaining how he came to possess $13,500 in cash he allegedly provided to Appellant, Miller spoke of a different woman whose house he obtained for $1 and who gifted him over $100,000 soon after meeting her. While relating his story, Appellant mentioned facts alluding to his alleged benefactor's expectation that he would provide assistance to local residents.
{¶ 40} A twenty-five page hand-printed letter, which was supposedly written by Miller's former benefactor, does not provide the support he attributes to it. The document is so rambling and strangely-worded that its contents can hardly be considered as summary judgment evidence against Appellant. In addition, the document was attached to Appellees' reply rather than their motion for summary judgment. Consequently, Appellant could not have responded to this or other items first produced in their reply to her response. We note Appellees moved for summary judgment prior to any discovery. In addition, Appellees failed to file an answer to the complaint, and this was not a Civ.R. 12(B)(6) motion converted to a summary judgment motion, which can toll the time for an answer.
{¶ 41} Regardless, Appellant submitted her affidavit based upon personal knowledge. Appellant's affidavit attested to the following: she owned 468 W. Midlothian Boulevard free and clear of liens; she never received a loan from Miller; she never intended to sign a personal loan document using her house as collateral (and would not have agreed to pay such a large amount per month); she never met Christina or received a loan from her; Miller brought her documents to allow her to obtain a grant and assistance from a trust to make repairs to her home; after the documents were reviewed, Miller put them in an envelope and they went to a notary; since she just read the documents, she "simply signed" the papers produced by Miller; while signing, the documents were on a clipboard, she viewed the signature pages as she signed them with the other pages flipped up, and she did not reread the documents or exam them closely; the documents Miller produced in this *72 lawsuit are not the documents she reviewed and saw him put in the envelope; and she believed the documents were switched or altered. Contrary to Appellees' contention, this was fairly specific and not a mere bald contradiction of Appellees' evidence. Moreover, Appellant's affidavit was not internally inconsistent; nor was it inconsistent with Appellant's deposition testimony (since she was not deposed).
{¶ 42} As Appellees emphasize, the December 2015 affidavit of the notary who acknowledged the deed provided evidence Appellant not only signed the second page of the deed but she also initialed the first page of the two-page deed in the notary's presence in April 2015. Still, the certification of acknowledgement on the second page of the deed simply refers to a signature, i.e., it does not guarantee knowledge of contents. There is also a relatively long time span between the notarization and the affidavit (when considering the topic of whether the first page was initialed in the notary's presence). Appellees suggested the notary remembered this case because the police approached the notary about Appellant's May 29, 2015 police report. Regardless, Appellant did not say she did not initial the first page of the paper presented at the BMV. The fact a person is asked to initial the first page in front of a notary in addition to signing the second page does not preclude a claim of fraud in the execution of the document, i.e., presentation of a page for initialing and a page for signature before the notary does not preclude an argument Miller presented her with different pages at her house related to grant money and switched them before arriving at the BMV.
{¶ 43} As to Appellant's statement the papers were flipped up on a clipboard so she only saw the signature pages, Appellees believe this cannot be true with regards to the two-page deed where Appellant initialed the first page and signed the second. However, the presence of other documents is not a precluded suggestion. Furthermore, Appellees are utilizing Appellant's signature on a five-page release to show the transfer of the deed was supported by consideration and was not fraudulent. There was only a signature on the final page and no initialed pages. Contrary to Appellees' suggestion, the fact a notary's later affidavit says the person acknowledged the information was true and correct does not establish the person knew the contents of the document; nor does it preclude a claim for fraud in the execution.
{¶ 44} Pursuant to R.C. 147.53, the person taking an acknowledgment shall certify that: (A) the person acknowledging appeared before him and acknowledged he executed the instrument; and (B) the person acknowledging was known to the person taking the acknowledgment, or that the person taking the acknowledgment had satisfactory evidence that the person acknowledging was the person described in and who executed the instrument. In other words, the notary certifies the person before the notary acknowledged she signed the instrument and provided evidence she was the person whose name was signed.
{¶ 45} Finally, what Appellant did after learning of the property transfer is a matter of weight and credibility. The complaint refers to receipt "[o]n or about April 21, 2015" of Miller's letter informing her of the property transfer. This is not Appellant's affidavit, and this is not an exact date. Notably, counsel used a date corresponding to the date Miller placed on the letter he left at Appellant's house. Additionally, Appellees' motion for summary judgment was not an affidavit, and the alleged texts between the parties after the date of the letter were not attached to the motion. (They were attached to a subsequent objection to an extension, which was *73 not part of the summary judgment motion practice.)
{¶ 46} Appellees set forth statements in support of summary judgment, such as: "When both sides of a controversy present arguments as diametrically diverse as in this case, something has to give way" or "[Appellant's affidavit] flew in the face of established evidence in this case." However, their summary judgment motion (even overlooking the unsworn facts and documents) did not create a state of "established evidence" which cannot be contradicted by the non-movant. Although a trier of fact may find against Appellant at a trial, we cannot say no rational fact-finder could find in Appellant's favor. For these reasons, the trial court's entry of summary judgment is reversed, and the case is remanded for further proceedings.
Donofrio, J., concurs.
DeGenaro, J., concurs.

Also on May 4, 2016, Appellees filed a "motion for entry of summary judgment" opining Kight's response to their summary judgment motion was late; they pointed to a February 1, 2016 magistrate's order stating Kight's response would be due 14 days after discovery and a later order extending discovery until April 15, 2016. Subsequent to the February 1, 2016 order providing 14 days after discovery to respond, the magistrate entered an order extending the discovery deadline and resetting the hearing on summary judgment to May 10, 2016. Kight relied on Mah.Cty.Loc.Crim.R. 6(A)(2), which provides: "In no event shall an opposition brief be filed later than five (5) days prior to the non-oral hearing date."